THE MORRIS AND ESSEX RAILROAD COMPANY AND THE DELAWARE, LACKAWANNA AND WESTERN RAILROAD COMPANY, DEFENDANTS IN ERROR, v. THE MAYOR AND COMMON COUNCIL OF THE CITY OF NEWARK, PLAINTIFF IN ERROR.

Argued March 4, 1908—Decided June 15, 1908.

1. An agreement, executed December 26th, 1901, was entered into between the railroad companies and the city of Newark, providing for the elevation and depression of their railroads, over and under certain streets and avenues within the city in order to avoid the dangers to life and property incident to street grade crossings. For its share of the cost of such changes the city agreed to pay, upon the completion of the work, to the companies, certain sums of money. *Held,* that the agreement was *intra vires* of the municipality under the act of the legislature passed and approved March 20th, 1901. *Pamph. L., p.* 116.

2. The title of the act sufficiently expresses its object.

3. The payment by the city of a recognized moral obligation assumed by it for services rendered at its request is within the legislative power to authorize, and does not constitute a donation or appropriation of the public funds within the prohibition of either section 19 or section 20 of article 1 of our state constitution.

On error to the Supreme Court.

For the plaintiff in error, *Herbert Boggs* and *Francis Child, Jr.*

For the defendants in error, *Conover English* and *Robert H. McCarter.*

The opinion of the court was delivered by

VREDENBURGH, J. The above railroad companies, on December 26th, 1901, entered into written agreement with the city of Newark providing for the elevation and depression of their railroads within the city's corporate limits above and under the grade of numerous streets and avenues crossed by their tracks. The work contemplated by the agreement has been fully completed by the railroad companies and this suit was brought by them to enforce payment from the city of the last installment of $150,000 still remaining unpaid of the total consideration of $600,000 agreed to be paid by the city to the companies for the completion of the entire work.

The plaintiffs declared specially for breach by defendant of its agreement to pay the last installment, adding to such special count the common counts for work done at defendant's request, &c., in the usual form in *assumpsit.* To this declaration the defendant filed a plea of the general issue, and upon plaintiffs' demand of a specification in writing of the defences intended to be made under that plea, the defendant has served a specification of defences setting up that it (the municipality) "had not the power, right or authority in law to make the alleged contract." By a stipulation of counsel it is admitted that the agreement, to which reference is above made, was in fact "signed and duly executed" by the defendant municipality with the plaintiffs; that the work required to be performed by the terms of the agreement was, in fact, duly performed by the plaintiffs; that the sum of $450,000 had been duly paid to the plaintiffs by the defendant for that work in accordance with those terms, and that the balance of $150,-000 sued for, although previously demanded, had not been paid. At the trial of the cause before the Supreme Court Circuit of the county of Essex, the city defended—*first,* that

the contract declared upon was *ultra vires,* and , void, and *second,* that the city not having (as claimed by it) the power to make the contract, none could be implied so as to sustain a recovery upon the common counts.

This defence was overruled by the trial court, and a verdict for the balance of money sued for, with interest, was, under exception by defendant, directed in favor of the plaintiffs below. The plaintiff in error makes before this court substantially the same insistment it made before the trial court. It is to be noted that the city does not claim there was any legal defect or informality whatever in the preliminary proceedings of the municipality authorizing its agents to execute the agreement, nor any fraud, mistake or surprise in its execution. The city's sole contention in this behalf is that the agreement to pay money to the railroad companies for this work was *ultra vires* because not conferred by any legislative •enactment, and was therefore void and unenforceable. We deem this position to be untenable, and that the statutory grant of power contained in the act of the legislature approved March 20th, 1901 (*Pamph. L., p.* 116), entitled "An act to authorize any town or city of this state to enter into contracts with railroad companies whose roads enter their corporate limits to change or elevate their railroads, and, when necessary for that purpose, to vacate, change the grade of, or alter the lines of any streets or highways therein," is amply sufficient. This title, we think, sufficiently expresses the object of the law. Its first section expressly empowers the proper municipal authorities of any city of the state to enter into such contracts with any of the railroad companies whose roads enter or lie within those cities as shall secure greater safety to persons and property therein, or facilitate the construction and maintenance of other than grade crossings of streets or highways, whereby the said railroad companies may locate, re-locate, change, alter grades of, depress or elevate their railroads within said cities, as in the judgment of such municipal authorities respectively may be best adapted to secure the safety of lives and properties, or to provide for other than grade crossings of streets or highways therein, or to promote

the interest of said cities respectively, and for that purpose shall have power to open, vacate, alter the lines or change the grades of any streets or highways within said cities, and to do all such acts as may be necessary and proper to effectually carry out such contracts. Its second section directs that such city shall provide the money necessary to do the work and make the payments required by any such contract, by the levy of a general tax for one or more years, or by the issue and sale of bonds of such city, and that such city shall have power, by annual taxation, or otherwise, to provide a sinking fund for the retirement of said bonds.

The intention of the legislature thus to provide a method by which cities (co-operating with railroads which enter their corporate limits and cross their streets at grade) can, by proper agreements with the latter for the purpose, procure the construction of such important public works in order to guard their citizens against the dangers of such crossings, could not have been, I think, much more plainly expressed. The route of the railroads in question extended, both as to their main, as well as their Montclair branch lines, through the city of Newark, crossing very numerous streets and avenues at grade.

We take judicial notice of the fact that Newark is a growing city, with a constantly expanding population and traffic, and that a large number of trains must be required to be run on the railroad tracks over the grade crossings there. This must constitute a constant menace to the lives of its citizens, and fully justified, in our opinion, its municipal authorities in taking advantage of the aid and authority of the statute in the execution of an enforceable contract between the city and the railroad companies in order to guard against such dangers. Without the action of the railroads in elevating and depressing their tracks at these grade crossings, and the concurrent act of the city in vacating the right of the public in the streets and highways involved, the relief from such dangers designed by the statute could not have been afforded. To accomplish this object and obtain this relief the agreement in question became necessary. The mutuality and interdependence of the

several undertakings of the contracting parties to each other under this agreement is apparent upon an examination of its very voluminous terms. They cannot be inserted here, but I think it will be sufficient, by way of a summary of them, to say that the city, on its part, contracted to vacate the public easements in, and change the grades of, certain streets and to pay the companies a fixed sum towards the work of construction agreed to be performed by them. That work embraced not only the elevation and depression of the track-beds of the railroads so as to avoid the grade crossings of the various highways, but also the erection of extensive stone, cement and brick retaining walls and abutments for highway bridges and along the streets affected by the work, the building of steel bridges, and the maintenance and renewal of the iron work (including the painting and concrete filling) of all bridges over the depressed tracks, together with a variety of other structural and expensive work. The intent of the parties to the agreement to make these structures a permanent improvement to the city, and as far as possible, ornamental to the locality where placed, is evident from the specifications of the expensive materials required to be used and the elaborate work to be done. For its share of the cost of these important works and extensive changes, the city covenanted to pay the companies upon completion, the total sum of money mentioned, including the amount now in controversy.

We think the agreement was within the capacity of the city to enter into by force of the statute cited above, and was not in excess of its corporate powers.

The contention in the brief of counsel for the city that the payment of the stipulated sums of money by the city to the railroad companies should be regarded as a voluntary "contribution" by the municipality and therefore prohibited by the constitutional mandates, sections 19 and 20, article 1; (19) declaring that "no county, city, borough, town, township or village shall hereafter give any money or property, or loan its money or credit, to or in aid of any individual association or corporation, or become security for or be directly or indirectly the owner of any stock or bonds of any association or corpora-

tion;" and (20) that "no donation of land or appropriation of money shall be made by the state or any municipal corporation to or for the use of any society, association or corporation whatever," does not seem to be sound for at least two reasons.

*First.* In addition to the said *quid pro quo* support of the consideration of this contract, the conceded facts and circumstances show that the promise of the city to pay the sum in controversy was not intended as a contribution or donation, but was founded also upon other valuable considerations passing to it from the companies. The latter, under the terms agreed upon, covenanted to convey, dedicate and abandon to the city for public uses certain considerable tracts of land and rights of way within the city limits, owned and occupied by the companies, the value of which is not fixed by the writing, and therefore, is incapable of computation by the court upon the record before us. Presumably it was, at least a valuable, if not an adequate consideration for the city's promise to pay. But whether an adequate or only partial consideration cannot be a subject of inquiry here. Hence the money agreed by the city to be paid in pursuance of the contract was in no legal or proper sense a contribution or donation by it.

*Second.* The purpose recited in the statute of securing the safety of the lives and properties of the citizens, sought to be accomplished by this work, was a beneficent and important public object and was, it must be admitted, the performance of a highly moral duty of the city towards its inhabitants. The payment of a recognized moral obligation assumed for services rendered has been held repeatedly by this court to be within the legislative power, and its discharge does not constitute a donation of the public funds. *Rader* v. *Township of Union,* 10 *Vroom* 509; *Rutgers College* v. *Morgan, Compt'r,* 41 *Id.* 460, 474. These authorities seem to be conclusive of this point.

Entertaining the view that, for the reasons stated, the city's legal liability to pay the sum in controversy is clear, we have not deemed it necessary to decide the further question of the

effect of. the city's acquiescence in the doing and completion of the work by the railroad companies, it being evidently unable to restore them to their former position. See *Camden and Atlantic Railroad Co.* v. *Mays Landing, &c., Railroad Co., 19 Vroom* 530; *Chapman* v. *Ironclad Rheostat Co., 33 Id. 497, and First Presbyterian Church* v. *State Bank, 28 Id. 27,* laying down the rule as to *private* corporations, and what was said, *obiter,* in this court relating to the question of estoppel as to *public* corporations, in the opinion of Mr. Justice Hendrickson, in the case of *Meday* v. *Rutherford, 36 Id.* 645, 648, citing 1 *Dill. Mun. Corp.,* § 548. But without regard to the effect of acquiescence by the city, the judgment below should be affirmed.

*For affirmance*—THE CHANCELLOR, GARRISON, SWAYZE, REED, TRENCHARD, PARKER, BERGEN, VOORHEES, MINTURN, BOGERT, VREDENBURGH, VROOM, GREEN, GRAY, DILL, J.J. 15.

*For reversal*—None.