ROBERT A. ROE, COMMISSIONER, ETC., *ET AL.*, PLAINTIFFS-RESPONDENTS, v. JOHN A. KERVICK, STATE TREASURER OF THE STATE OF NEW JERSEY, DEFENDANT-APPELLANT.

Argued January 20, 21, 1964—Decided April 20, 1964.

194

196

Mr. *Daniel Amster* argued the cause for defendant-appellant.

Mr. *Alan B. Handler,* Deputy Attorney of New Jersey, argued the cause for plaintiffs-respondents (*Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney).

The opinion of the court was delivered by

FRANCIS, J. This is a proceeding under *N. J. S.* 2A:16–50 *et seq.* seeking a declaratory judgment as to the constitutionality of *L.* 1962, *c.* 204, *N. J. S. A.* 13:1B–15.13 *et seq.,* commonly called "The New Jersey State Area Redevelopment Assistance Act." The action was necessary because the defendant State Treasurer declined to lend money as authorized by the statute for the use of the New Jersey Area Redevelopment Authority. The declination was based primarily upon his doubt as to whether the various loans or advances of money contemplated by the legislation constituted a lending of the credit of the State, county or municipality, or loans or appropriation of money of the State, county or municipality in aid of a private person, association or corporation in violation of *Article* VIII, *Section* II, *paragraph* 1, and *Section* III, *paragraphs* 2 and 3 of the State Constitution. The Superior Court, Law Division, declared the act constitutional.

This appeal followed and we certified it before argument in the Appellate Division.

I.

The Area Redevelopment Assistance Act created in the Department of Conservation and Economic Development the New Jersey Area Redevelopment Authority, "a public corporation and government instrumentality" of the State. Members of the managing board of the Authority are: (1) the Commissioner of Conservation and Economic Development, (2) Commissioner of Banking and Insurance, (3) Commissioner of Labor and Industry, (4) the State Treasurer, and (5) five public members appointed by the Governor with the advice and consent of the Senate. *L. 1962, c. 204,* § 3, *N. J. S. A.* 13:1B–15.15.

The purpose of the act was declared to be "to assist area redevelopment agencies to establish area redevelopment projects within the State, to assist in obtaining such Federal financial assistance as may be available and to provide such additional financial assistance as may be required, which assistance shall not exceed, in total, 10% of the cost of establishing an area redevelopment project which cost shall be divided equally between the authority and the municipality or county or other public or *quasi*-public agency which is qualified to provide such assistance." *Id.* § 4, *N. J. S. A.* 13:1B–15.16.

Among other things, the Authority is given powers, (1) to determine on application of an area redevelopment agency the financial assistance required by it to establish and maintain an area redevelopment project, and whether such agency has qualified for federal financial assistance; (2) to approve the agencies which meet the conditions specified in the act for financial assistance; (3) to enter into agreements with counties and municipalities to provide for financial assistance to such approved agencies; (4) upon proper application of such agencies to make loans to them from moneys held in the area

redevelopment fund, and to provide for repayment as required by the act; to purchase, upon application of such agencies, evidences of indebtedness, and to provide for repayment as required by the act; (5) to make all contracts and execute the necessary instruments to accomplish the statutory purposes; (6) to accept grants from, and to enter into contracts or other transactions with any federal agency; (7) to determine, upon proper application of area redevelopment agencies, whether the declared public purpose of the act will be accomplished by the establishment of an area redevelopment project in a redevelopment area; (8) to take title by foreclosure to any project where the acquisition is necessary to protect any loan previously made by the Authority, and to sell, transfer and convey any such project to a responsible buyer, or if a sale, transfer or conveyance cannot be accomplished promptly, then but only then, in order to minimize financial losses and to sustain employment, the Authority may lease the project to a responsible tenant; (9) under rules and regulations prescribed by the Authority, it may assign or sell at public or private sale or otherwise dispose of for cash or credit on terms and for consideration it deems reasonable, any evidence of indebtedness, contract, claim, personal property or security held by it in connection with loans made or evidences of indebtedness purchased or held under the act; (10) to deal freely by way of improvement, rental or sale with real or personal property acquired in connection with loans made or evidences of indebtedness purchased under the act. *Id.* § 5, *N. J. S. A.* 13:1B–15.17.

The terms "redevelopment area," area "redevelopment agency" and "area redevelopment project" or "project" are defined specifically. "Redevelopment area" is any area within the State which has been designated as such by the Secretary of Commerce of the United States pursuant to the provisions of Public Law 87-27 (1961), the Federal Area Redevelopment Act, 42 *U. S. C. A.* § 2501 *et seq.* "Area redevelopment agency" means

"\* \* \* any person, partnership, firm, company or corporation deemed by the authority after proper investigation to be capable of assuming all obligations prescribed by the authority in the establishment of an area redevelopment project and in the operation of an industrial or commercial enterprise therein or thereon."

"Area redevelopment project" means

"\* \* \* the acquisition and development of land within a redevelopment area, the construction of new buildings, the rehabilitation of abandoned or unoccupied buildings and the alteration, conversion or enlargement of existing buildings which undertaking comprises or is connected with or part of an industrial enterprise established or to be established by an area redevelopment agency and may also include, in cases of demonstrated need, machinery and equipment." *Id.* § 1(e), (h), (g), *N. J. S. A.* 13:1B–15.13(e), (h), (g).

When the Authority decides upon application of an area redevelopment agency that the establishment of a project will be to the economic well-being of the area in which it will be located, a contract may be made to furnish the agency with an amount not in excess of 10% of the cost thereof which sum "shall be provided ½ by a loan from the authority to the agency and ½ by a loan from a county or municipality in which the agency is located \* \* \*." *Id.* § 6, *N. J. S. A.* 13:1B–15.18. The financial assistance shall be supplied *on such terms* and interest as the Authority determines and, unless otherwise decided, it shall be secured by a mortgage of the agency on the project. Except as permitted by the act, the mortgage must be a second mortgage and subordinate only to the mortgage securing the first lien obligation issued to secure the commitment of funds from independent and responsible sources and used in the financing of the project. The money furnished by the Authority to the area redevelopment agencies is to be withdrawn from the area redevelopment fund. *Id.* § 7, *N. J. S. A.* 13:1B–15.19. That fund is not derived from tax revenues but from a 30-year noninterest-bearing loan not exceeding $500,000 which the State Treasurer is authorized to make out of the escheat account established by *N. J. S.* 2A:37–41. *Id.* § 10, *N. J. S. A.* 13:1B–15.21 note. The fund is to be held by the State Treasurer for

purposes of the act, money to be paid therefrom on warrant or other order of the treasurer of the Authority or other person authorized to do so by the Authority with the approval of the Commissioner of Conservation and Economic Development. *Id.* § 9, *N. J. S. A.* 13 :1B–15.21.

█ The first circumstance which must come into being before proceedings relating to a specific project can be initiated under the act is a designation by the United States Secretary of Commerce that the area where the project is to be located is a "redevelopment area." The Secretary is authorized to make such designation under certain standards and regulations established by the Federal Area Redevelopment act, *supra,* 42 *U. S. C. A.* § 2501, adopted May 1, 1961. The New Jersey act complements and integrates with the federal statute which seeks to establish a pattern of national and state cooperative action for dealing with local depressed area redevelopment. See Congressional declaration of purpose, 42 *U. S. C. A.* § 2501. Under section 2504, the Secretary is required to designate as redevelopment areas those areas within the United States wherein he determines there has existed "substantial and persistent unemployment" for an extended period of time. In making the determination he is directed to use standards generally comparable to those set forth in paragraphs (1) and (2) of the section. These paragraphs are as follows:

"(1) [W]here the Secretary of Labor finds that the rate of unemployment, excluding unemployment due primarily to temporary or seasonal factors, is currently 6 per centum or more and has averaged at least 6 per centum for the qualifying time periods specified in paragraph (2) ; and

(2) where the Secretary of Labor finds that the annual average rate of unemployment has been at least—

(A) 50 per centum above the national average for three of the preceding four calendar years, or

(B) 75 per centum above the national average for two of the preceding three calendar years, or

(C) 100 per centum above the national average for one of the preceding two calendar years."

The Secretary of Labor is directed by the same section to find the facts and provide the data to be used by the Secretary in designating the redevelopment areas.

Subsection (b) of section 2504 requires the Secretary of Commerce to designate as redevelopment areas also those areas which do not meet the requirements set forth above but which he "determines are among the highest in numbers and percentages of low-income families, and in which there exists a condition of substantial and persistent unemployment or underemployment." The Secretary must prescribe detailed standards upon which such designations shall be based, in the formulation of which he is to consider, among other relevant factors,

"* * * the number of low-income farm families in the various rural areas of the United States, the proportion that such low-income families are of the total farm families of each of such areas, the relationship of the income levels of the families in each such area to the general levels of income in the United States, the extent to which 'rural development' projects have previously been located in any such area under programs administered by the Department of Agriculture, the current and prospective employment opportunities in each such area, the availability of manpower in each such area for supplemental employment, the extent of migration out of the area, and the proportion of the population of each such area which has been receiving public assistance from the Federal Government or from the State or States in which such area is located or from any municipality therein.

* * * * * · * * *

In making these determinations the Secretary shall be guided, but not conclusively governed, by pertinent studies made, and information and data collected or compiled, by (1) departments, agencies, and instrumentalities of the Federal Government, (2) State and local governments, (3) universities and land-grant colleges, and (4) private organizations."

An affidavit appearing in the record executed by the State Coordinator under the Federal Area Redevelopment Act says there are presently in New Jersey six counties which contain redevelopment areas within the federal act criteria set forth above. (The affidavit does not state that the Secretary of Commerce has made the designations. The unemployment

statistics set forth therein, however, clearly bring the municipalities mentioned within the class which under 42 *U. S. C. A.* § 2504, *supra,* requires such designation. Consequently, for purposes of this case, we shall assume that the designation has been made.) The areas are: Atlantic City in Atlantic County, Ocean City, Wildwood and Cape May in Cape May County, Bridgeton in Cumberland County, Long Branch in Monmouth County, Lakewood and Toms River in Ocean County, Paterson and Passaic in Passaic County.

When the Secretary of Commerce has denominated a locality in New Jersey a redevelopment area, an area redevelopment agency (which, as defined above, is a private person or entity) may apply to the Redevelopment Authority for the financial assistance authorized by the act in order to establish an industrial project in the area. From the standpoint of participation by a public agency, the financial assistance, if granted, would be a tripartite affair involving the federal government, the State Authority and a county or municipality, *i. e.,* a maximum of 65% of the cost of the project from the Secretary of Commerce, 5% from the Authority and 5% from the county or municipality where the project is to be located. 42 *U. S. C. A.* § 2505(a), (b)(9).

Certain criteria must be met before the Authority can approve the application of an area redevelopment agency for financial assistance from the area redevelopment fund or from a county or municipality (implemented as they are or undoubtedly will be by Authority-prescribed regulations):

(1) The Department of Conservation and Economic Development has established and is operating an over-all program for the economic development of redevelopment areas. This regulation is the counterpart of 42 *U. S. C. A.* § 2505(b)(10) which forbids federal financial assistance unless "there shall be submitted to and approved by the Secretary an overall program for the economic development of the area * * *."

(2) The agency has qualified for federal assistance. *L.* 1962, *c.* 204, § 5(a)(2), *N. J. S. A.* 13:1B–15.17(a)(2).

(3) The agency is capable of assuming all obligations prescribed by the Authority in the establishment of the project, and in the operation of the proposed industrial or commercial enterprise. *Id.* § 1(h), *N. J. S. A.* 13:1B–15.13(h).

(4) The project is feasible and practicable. *Id.* § 1(i), *N. J. S. A.* 13:1B–15.13(i).

(5) The purpose of the act will be accomplished by the establishment of the project. *Id.* § 5(k), *N. J. S. A.* 13:1B–15.17(k).

(6) The amount of financial assistance required must be proved. *Id.* § 5(a)(1), *N. J. S. A.* 13:1B–15.17(a)(1).

(7) No loan can be made by the Authority or the county or municipality unless the agency contracts to provide specified employment opportunities to such number of persons in the area as shall be agreed upon, and agrees to carry on the particular activities for which the project is being established on a regular and continuous basis "unless economic conditions will not otherwise permit for such period of time as shall be agreed upon." *Id.* § 8, *N. J. S. A.* 13:1B–15.20.

As indicated above, after investigation, including public or private hearing when deemed advisable, if the Authority concludes that the enumerated criteria have been satisfied and that the project will be to the economic advantage of the area, it may contract to supply to the agency an amount not in excess of 10% of the cost of establishing the project on agreed terms of repayment and interest, the amount to be furnished one-half by the Authority and one-half by the county or municipality. Upon execution of the necessary contracts by the federal government, the Authority, county or municipality, and the area redevelopment agency, the Authority may issue a warrant against the redevelopment fund for its agreed share of the financial assistance.

The record discloses that certain project applications of area redevelopment agencies have been approved by the Federal Area Redevelopment Administrator and are awaiting approval by the State Authority. In anticipation of approval of some

such applications and the resulting commitment to supply the 5% financial assistance, the plaintiffs Richard A. Roe, Commissioner of the State Department of Conservation and Economic Development, and the New Jersey Redevelopment Authority requested the State Treasurer to lend sufficient money to the area redevelopment fund established by section 10 of the Area Redevelopment Assistance Act to enable the Authority to make the loans to be approved by it in the administration of the act. As has been noted above, however, the State Treasurer, having conscientious doubts about the constitutionality of the act, and particularly of its loan provisions, declined to make any such deposits. The Commissioner and the Authority then instituted this declaratory judgment action to settle the issue.

## II.

The State Treasurer's principal challenge to the constitutionality of the Area Redevelopment Assistance Act has two aspects. First, with respect to the State action, he questions (a) the validity of the loan up to $500,000 from the escheat fund to the Area Redevelopment Fund which is authorized by section 10 to enable the Authority to carry out the purposes of the act, and (b) the validity of loans from the Authority to area redevelopment agencies to assist in the financing of redevelopment projects. Such loans, he suggests, constitute the direct or indirect lending of the State's credit or the appropriation of money for private purposes contrary to *Article* VIII, *Section* II, *paragraph* 1 and *Section* III, *paragraphs* 2 and 3 of the Constitution. Second, he questions the legal propriety of loans from counties or municipalities to area redevelopment agencies to assist in financing such projects. These loans, he suggests, amount to a loaning of money or credit or an appropriation of money by counties or municipalities for private use in violation of *Article* VIII, *Section* III, *paragraphs* 2 and 3 of the Constitution.

The portions of *Article* VIII of the Constitution referred to are as follows:

SECTION II

*Par.* 1. "The credit of the State shall not be directly or indirectly loaned in any case."

SECTION III

*Par.* 2. "No county, city, borough, town, township or village shall hereafter give any money or property, or loan its money or credit, to or in aid of any individual, association or corporation, or become security for, or be directly or indirectly the owner of, any stock or bonds of any association or corporation."

*Par.* 3. "No donation of land or appropriation of money shall be made by the State or any county or municipal corporation to or for the use of any society, association or corporation whatever."

The organization of the Area Redevelopment Assistance Act indicates that the Legislature contemplated a meshing of three interdependent links at three · levels of government: federal, State and county or municipal financial assistance to a redevelopment project. If the scheme breaks down at the state or local level because of conflict with the Constitution, the legislative purpose cannot be accomplished. For that reason we agree the State Treasurer has standing to challenge the validity of the plan for participation in the financing at both state and county or municipal levels.

Historically, the forces which motivated the constitutional prohibitions recited above, in this and most states of the Union, are clear. During the nineteenth century states and their political subdivisions frequently undertook to encourage the development of railroads by furnishing financial aid. Such assistance was in the form of direct loans or gifts of public money or property, or by bond issues, or subscription to stock of the companies. Many abuses followed in the wake of such practices to the serious detriment of the taxpayer. See *Hoglund v. City of Summit,* 28 *N. J.* 540, 548 (1959); *Wilentz v. Hendrickson,* 133 *N. J. Eq.* 447, 487 (*Ch.* 1943), affirmed 135 *N. J. Eq.* 244 (*E. & A.* 1944); *Carr v. Merchantville,* 102 *N. J. L.* 553, 557 (*Sup. Ct.* 1926); 2 *Antieau, Municipal Corporation Law,* § 15.04, *pp.* 358–368 (1963); Pinsky, "State Constitutional Limitations on Public Industrial Financing: An Historical and Economic Approach," 111 *U. Pa. L. Rev.* 265, 277–280 (1963); Note, "State Constitutional

Limitations on a Municipality's Power to Appropriate Funds or Extend Credit to Individuals and Associations," 108 *U. Pa. L. Rev.* 95, 97 (1959). As one court commented in an early case:

"[W]hen the State once enters upon the business of subsidies, we shall not fail to discover that the strong and powerful interests are those most likely to control legislation, and that the weaker will be taxed to enhance the profits of the stronger." *People ex rel. Detroit & H. R. R. v. Township Board*, 20 *Mich.* 452, 487 (*Sup. Ct.* 1870).

■ The strictures of *Article* VIII, which were adopted in 1875, were simply the retreat to a fundamental doctrine of government, *i. e.*, that public money should be raised and used only for public purposes. The article brought the doctrine into the organic law and thus established as basic policy a prohibition against lending the credit of the State directly or indirectly, or loaning, giving or donating its money or property or that of its subdivisions to or for the use of an individual, association or corporation for private purposes.

■■ But when is public money or credit being given or loaned for a private, as distinguished from a public, purpose? The concept of public purpose is a broad one. Generally speaking, it connotes an activity which serves as a benefit to the community as a whole, and which, at the same time is directly related to the functions of government. Moreover, it cannot be static in its implications. To be serviceable it must expand when necessary to encompass changing public needs of a modern dynamic society. Thus it is incapable of exact or perduring definition. In each instance where the test is to be applied the decision must be reached with reference to the object sought to be accomplished and to the degree and manner in which the object affects the public welfare. *Hoglund v. City of Summit, supra* (28 *N. J.*, at *p.* 549); *DeArmond v. Alaska State Development Corporation*, 376 *P. 2d* 717 (*Alaska Sup. Ct.* 1962); *City of Frostberg v. Jenkins*, 215 *Md.* 9, 136 *A. 2d* 852, 855 (*Ct. App.* 1957); *Opinion to the Governor*, 76 *R. I.* 249, 69 *A. 2d* 531 (*Sup. Ct.* 1949); *Rhyne, Municipal Law*, § 15–4, *p.* 341 (1957).

208

The Treasurer contends that since the legislatively-authorized loans from the Authority and counties or municipalities are designed to provide funds for the establishment or assistance of private business ventures, they cannot be regarded as serving such a public purpose as would not offend Article VIII of the Constitution. For purposes of this opinion and the result reached herein, there is no need to attempt to distinguish between the prohibition against the lending of credit or the appropriation of money by the State or any county or municipality to or for the use of any private corporation, in *Article VIII, Section III, paragraph 3,* and the prohibition against loans by a county or municipality to or for the use of any such corporation, in *paragraph 2* of *Article VIII, Section III.*

██ The design of the Area Redevelopment Assistance Act is to alleviate unemployment in localities where that condition has been substantial and persistent. While the statute does not expressly say so, the conclusion is inescapable, especially when it is read in conjunction with the federal act which it is designed to implement. If the Secretary of Commerce, on applying the specific standards set down in 42 *U. S. C. A.* § 2504, does not find a particular New Jersey area to be suffering from substantial and persistent unemployment, it cannot be designated a redevelopment area. In such case the financial assistance authorized by the federal law for an industrial project in the area cannot be furnished; nor can the agency be recognized as an applicant for such assistance under the New Jersey act. Thus, the acid test for recourse to either enactment is the existence of substantial and persistent unemployment to the necessary degree in the area and a consequent designation by the Secretary of Commerce of that locality as a redevelopment area.

The federal act contains a Congressional declaration of purpose which beyond doubt provided the motivation for our Legislature. It says:

"The Congress declares that the maintenance of the national economy at a high level is vital to the best interests of the United

States, but that some of our communities are suffering substantial and persistent unemployment and underemployment; that such unemployment and underemployment cause hardship to many individuals and their families and detract from the national welfare by wasting vital human resources; that to overcome this problem the Federal Government, in cooperation with the States, should help areas of substantial and persistent unemployment and underemployment to take effective steps in planning and financing their economic redevelopment; that Federal assistance to communities, industries, enterprises, and individuals in areas needing redevelopment should enable such areas to achieve lasting improvement and enhance the domestic prosperity by the establishment of stable and diversified local economies and improved local living conditions; and that under the provisions of this chapter new employment opportunities should be created by developing and expanding new and existing facilities and resources rather than by merely transferring jobs from one area of the United States to another." 42 *U. S. C. A.* § 2501.

That statement of purpose was predicated upon the elaborate House Report which followed extensive hearings on the desirability of such legislation. *H. R. Rep. No.* 186, *87th Cong., 1st Sess., 2 U. S. Code Cong. & Adm. News* 1567 *et seq.* (1961). Excerpts from the report are helpful for perspective purposes.

"The need for prompt action to combat localized chronic unemployment problems is supported by abundant evidence and is now generally accepted. The facts of the case have been spelled out in Government statistics and in thousands of pages of congressional testimony. In fact, most observers agree that the delays which have prevented the enactment of area redevelopment legislation in past years have cost us dearly. While the greatest cost has been borne in those areas directly affected by basic economic problems, there has also been a heavy cost to the entire Nation both in terms of additional Government outlays for unemployment compensation and relief payments, and in terms of lost production and idle resources. These are costs which our Nation cannot afford at any time but particularly not in the present international situation when we are engaged in a critical economic struggle.

The effects of localized unemployment are felt throughout the economic system. In our closely interrelated economy, no community is self-sufficient. Each area depends on other areas for markets for the goods and services it produces. Depressed conditions in one community are reflected in reduced demand in others which in turn results in fewer jobs. If allowed to continue, unemployment and economic stagnation may very well spread to other areas. If, on the other hand, the areas which are now suffering from heavy chronic unem-

ployment can be restored to prosperous conditions, the entire Nation will benefit through the increase in total demand and business activity." (at *p*. 1572)

With respect to that portion of the federal bill specifically providing for industrial or commercial projects as a means of countering unemployment, the House Report stated:

"Many areas of chronic unemployment are well supplied with skilled labor or have a surplus of labor which can be trained for industrial skills. Often they have existing idle plant capacity though this is frequently in need of rehabilitation or remodeling to adapt it to other uses. Many of the areas are well situated near important markets, present or potential, for the goods they could produce. One ingredient is commonly lacking, however, and that is adequate capital resources. The very fact of an economic slump in an area generally absorbs local capital and outside lenders are frequently reluctant to enter the area. Your committee greatly admires the energetic and imaginative efforts of some communities to raise capital through local economic development organizations but the testimony given in hearings clearly indicates that there is a limit to what can be accomplished by these efforts.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

In view of this clear need for additional capital, an essential part of any meaningful Federal program of assistance for areas of chronic unemployment is a provision for loans on reasonable terms. Such assistance will enable these communities to help themselves. It is not a give-away or a subsidy since these are loans to be repaid with interest. To meet this need the committee amendment authorizes loans for industrial and commercial projects in designated areas. These projects may include the construction of new plants, rehabilitation and improvement of existing buildings and, in exceptional cases, the purchase of machinery and equipment. The loans may be for a period of up to 25 years and cover up to 65 percent of the cost of the project. At least 10 percent of the cost must be met by funds supplied by the State or community or a nonprofit local organization. At least 5 percent must be provided by private lending facilities.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

These loans can only be made to applicants, both public and private, which are approved by an agency of the State in which the project is to be located. It must be determined that the project will provide more than just a temporary alleviation of unemployment and that the financial assistance applied for is not otherwise available from private lenders or other Federal agencies on reasonable terms. In addition, the community in which the project is to be located must have prepared a general economic redevelopment program which meets the approval of the Secretary and it must be determined that the project fits in with that program." *Ibid.*, at *pp*. 1578–1579.

Included in the appendices to the House Report was a list of areas of substantial and persistent unemployment located in New Jersey, which would meet the criteria for *mandatory* designation as "redevelopment areas" under the federal law in 1961. These areas included Atlantic City, Bridgeton, Long Branch, Ocean City, Wildwood and Cape May. *Id.*, at *p.* 1584, 1585. In the period preceding the passage of the Area Redevelopment Assistance Act, federal studies indicated that substantial and chronic unemployment persisted in the major New Jersey labor market areas which had been specified in the Federal Area Redevelopment Act. The studies showed:

| Area | Total Work Force | Over-all Unemployment | Ratio | Classification |
|---|---|---|---|---|
| Atlantic City | 71,200 | 7,000 | 9.8 | 2/ |
| Ocean City– Wildwood– Cape May | 21,050 | 2,600 | 12.4 | 2/ |
| Bridgeton | 49,500 | 3,150 | 6.4 | 2/ |
| Lakewood– Toms River | 35,800 | 2,800 | 7.8 | 2/ |
| Long Branch | 107,700 | 1,000 [*sic*] | 7.4 | 2/ |

2/ Areas of "substantial and persistent unemployment." The Long Branch area originally included all of Monmouth and Ocean Counties. After July 1, 1961 it relates to Monmouth County only. *Division of Employment Security, State of New Jersey, Annual Report,* 1961, *pp.* 31–32 and 36.[1] These figures are especially significant when compared to national

---

[1] In the 1962 Annual Report of the Division of Employment Security (at *p.* 15), the conditions of unemployment in these labor market areas remained about the same:

| Area | Total Work Force | Over-all Unemployment | Ratio | Classification |
|---|---|---|---|---|
| Atlantic City | 71,200 | 6,000 | 8.4 | 2/ |
| Ocean City– Wildwood– Cape May | 19,300 | 2,800 | 14.5 | 2/ |
| Bridgeton | 52,800 | 3,900 | 7.4 | 2/ |
| Toms River | 35,300 | 2,900 | 8.2 | 2/ |
| Long Branch | 113,100 | 8,100 | 7.2 | 2/ |

212

unemployment figures which disclose that only 5.5% of the total working force was unemployed. *Employment & Earnings, July,* 1962, *U. S. Bureau of Labor Statistics,* p. iii.

Since it is apparent that the aim of the New Jersey Area Redevelopment Assistance Act is to relieve areas of substantial and persistent unemployment through financial aid, two questions emerge: (1) Is legislative provision for financial aid to relieve unemployment a public purpose, and (2) if so, is the method of relief provided in this instance so consonant with the accomplishment of that public purpose as to be beyond the limitations on the use of public money laid down by *Article* VIII of the Constitution?

An elementary object of government is to protect and further the health, safety and general welfare of the people. All of its myriad. activities have that end in view. Whenever a condition of affairs appears in the state which presents a substantial threat to the accomplishment of that object, a governmental duty arises to apply within constitutional limits whatever measures are necessary and appropriate to check it. *New York City Housing Auth. v. Muller,* 270 *N. Y.* 333, 1 *N. E. 2d* 153, 105 *A. L. R.* 905 (*Ct. App.* 1936).

Relief of the poor has been considered an obligation of government since the organization of our State. Such relief has been regarded as a direct charge on the body politic for its own preservation and protection, standing very much in the same position as the preservation of law and order. Expenditure of money for that purpose by the State or a subdivision of local government pursuant to legislative authority is looked upon as the performance of a governmental function. See *Commonwealth ex rel. v. Liveright,* 308 *Pa.* 35, 161 *A.* 697 (*Sup. Ct.* 1932); *Hager v. Kentucky Children's Home Soc.,* 119 *Ky.* 235, 83 *S. W.* 605, 606, 67 *L. R. A.* 815 (*Ct. App.* 1904); 51 *Am. Jur., Taxation,* § 350, *p.* 394 (1944); 41 *Am. Jur., Poor & Poor Laws,* § 5, *p.* 684 (1942); 2 *Antieau, supra,* § 15.29, *p.* 438. No one suggests use of public funds to sustain the impoverished constitutes a donation or gift transgressive of *Article* VIII of the Constitution.

Before statehood was achieved, the Legislature of the colony adopted measures for relief of the poor. See *Laws of New Jersey* 1774, *Paterson, p.* 26 *et seq.* (1800). It may be noted that the statute which probably reflected the mores of the times authorized "if it shall be thought expedient" the imposition of a requirement that the relief recipient and his family wear "a large P * * * in an open and visible manner * * * upon the shoulder of the right sleeve of [his] upper garment." It would be difficult to find a more striking example of changing social consciousness than the contrast between that statute and the Area Redevelopment Assistance Act under attack here.

The Annotated Statutes abound with examples of legislative enactments in aid of the poor. The poor may be given financial aid at home, *R. S.* 44:1–1, 44:1–88, 44:1–128, 44:4–93, or in a county or municipal welfare house, *R. S.* 44:2–1, 44:1–3, 44:3–1. One county may contract with another for the care of its indigent, *R. S.* 44:1–32. Medical, surgical and nursing care as well as public or private hospitalization may be furnished, *R. S.* 44:1–152–154, 44:8–147. A municipality which does not have its own hospital may appropriate an adequate sum annually to be applied to the payment of the cost of maintaining and treating its indigents in a private hospital within its borders or in such a hospital in another municipality. The sum appropriated may be applied also to assist in the support of such hospitals. *N. J. S. A.* 44:5–2. The same authority has been granted to counties. *N. J. S. A.* 44:5–11. A municipality may provide for the burial of the poor and may purchase a cemetery for the purpose. *R. S.* 44:1–157, 158.

In times of national or local economic stress financial aid in various forms, but similar to poor relief, has been given to the involuntarily unemployed. See *Commonwealth ex rel. v. Liveright, supra; Jennings v. City of St. Louis*, 332 *Mo.* 173, 58 *S. W. 2d* 979, 87 *A. L. R.* 365 (*Sup. Ct.* 1933); *Alameda County v. Janssen*, 16 *Cal. 2d* 276, 106 *P. 2d* 11, 130 *A. L. R.* 1141 (*Sup. Ct.* 1940); *City of Los Angeles v.*

*Post War Public Works Review Board,* 26 *Cal.* 2d 101, 156 *P.* 2d 746 (*Sup. Ct.* 1945); Annotation, 87 *A. L. R.* 371 (1933). But this was the dole and in the vast majority of cases it was an affront to human dignity. The degree of the affront rested in considerable measure on the length of the period of idleness of men and women who wanted jobs, not relief.

Such financial assistance was not considered donations or loans within the contemplation of constitutional provisions akin to our *Article* VIII. It was regarded as the expenditure of public money for public purposes and the *quid pro quo* was deemed to be the preservation of public safety and welfare.

The United States Supreme Court in *Carmichael v. Southern Coal & Coke Co.,* 301 *U. S.* 495, 515–517, 57 *S. Ct.* 868, 81 *L. Ed.* 1245 (1936) gave eloquent recognition to the public character of such expenditures.

"Support of the poor has long been recognized as a public purpose. * * * We need not labor the point that expenditures for the relief of the unemployed, conditioned on unemployment alone, without proof of indigence of recipients of the benefits, [are] a permissible use of state funds. For the past six years the nation, unhappily, has been placed in a position to learn at first hand the nature and extent of the problem of unemployment, and to appreciate its profound influence upon the public welfare. Detailed accounts of the problem and its social and economic consequences, to be found in public reports of the expenditures of relief funds, and in the studies of many observers, afford a basis for the legislative judgment. It suffices to say that they show that unemployment apparently has become a permanent incident of our industrial system; that it varies, in extent and intensity, with fluctuations in the volume of seasonal businesses and with the business cycle. It is dependent, with special and unpredictable manifestations, upon technological changes and advances in methods of manufacture, upon changing demands for manufactured products— dictated by changes in fashion or the creation of desirable substitutes, and upon the establishment of new sources of competition.

The evils of the attendant social and economic wastage permeate the entire social structure. Apart from poverty, or a less extreme impairment of the savings which afford the chief protection to the working class against old age and the hazards of illness, a matter of inestimable consequence to society as a whole, and apart from the loss of purchasing power, the legislature could have concluded that unemployment brings in its wake increase in vagrancy and crimes against property, reduction in the number of marriages, deterioration

of family life, decline in the birth rate, increase in illegitimate births, impairment of the health of the unemployed and their families and malnutrition of their children."

The point that expenditures for relief of unemployment at the state or local level may be authorized by the legislature and serve a beneficent public purpose, a purpose which is governmental in nature, need not be labored. It is self-evident. *In re Opinion of the Justices,* 177 *A.* 2d 205 (*Del. Sup. Ct.* 1962); *Industrial Development Auth. v. Eastern Ky. Reg. Pl. Com'n.,* 332 *S. W.* 2d 274 (*Ky. Ct. App.* 1960); *McConnell v. City of Lebanon,* 203 *Tenn.* 498, 314 *S. W.* 2d 12 (*Sup. Ct.* 1958); *City of Frostberg v. Jenkins, supra; Dyche v. City of London,* 288 *S. W.* 2d 648 (*Ky. Ct. App.* 1956); *McNichols v. City and County of Denver,* 101 *Colo.* 316, 74 *P.* 2d 99 (*Sup. Ct.* 1937); *Albritton v. City of Winona,* 181 *Miss.* 75, 178 *So.* 799, 804, 115 *A. L. R.* 1436 (*Sup. Ct.* 1939); 2 *Antieau, supra,* § 15.29, *p.* 438; *Rhyne, supra,* § 15–7, *p.* 347.

In declaring that state relief of unemployment was a public purpose, the United States Supreme Court in *Carmichael* was passing upon the constitutionality of a tax to create a fund for the payment of unemployment compensation. Although such compensation statutes represent one of the major legislative advances of our time, they are not a panacea for unemployment. They were designed to provide a measure of sustenance for workers during temporary periods of loss of work. The payments no longer had the numbing and depressing character of the dole; they became the right of the worker by virtue of the unemployment compensation law, *R. S.* 43:21–1 *et seq.* But the term for which the compensation was payable was limited, and in areas of substantial and persistent unemployment, frequently work was not available when authorized benefits became exhausted. This meant in many cases return of the worker to the relief roll and consequent increase in taxes to meet the greater demands on the public treasury. The social consciousness of legislators which, on the national scene and in many states, had produced laws for the elimination of

slums and for the construction of low-cost housing, then turned in the direction of such remedial measures as the Area Redevelopment Assistance Act which is challenged in this proceeding. Efforts began to prevent unemployment in distress areas in order to avoid having to relieve it after it occurred. Some idea of the value of such efforts, if successful, can be gathered from the House Report, *supra*. If through the redevelopment program the unemployment rate in the major chronically distressed areas could have been reduced to the average for the nation as a whole between May 1957 and January 1961, a rough calculation indicates that unemployment compensation payments would have been reduced in those areas by somewhere between $100 million and $200 million, depending upon what proportion of the workers had exhausted their benefits in 1960. In addition to unemployment compensation benefits, relief payments would drop considerably. The Report says no comprehensive figures were available, but that it was clear the total would run into hundreds of millions of dollars. A single illustration is furnished:

"For example, it was brought out at the hearings that in the single year 1960, unemployment compensation paid in the 16 areas of chronic unemployment in the State of Pennsylvania alone totaled over $82 million while public assistance benefits added another $48 million. It was estimated that if the unemployment in these 16 areas had been brought down to 3 percent of the labor force, there would have been a saving in these two benefits of nearly $90 million in that one year in that one State." 2 *U. S. Code Cong. Adm. News, supra, p.* 1575.

Although it may be said generally that relief of unemployment constitutes a public purpose, obviously the legislative mechanism employed to accomplish it cannot conflict with the constitutional proscription against the lending of the State's credit or the appropriation of its money or the donation or loan of a county's or municipality's money to, or in the aid of, or to the use of, any private person or corporation. Does the fact that loans representing 5% of the cost of establishing a particular area redevelopment project come from the Authority and 5% from the county or municipality where it

is to be located run afoul of the Constitution because they are to be granted to a private profit organization?

Obviously the State, county or municipality could devote public funds to direct relief of chronic unemployment or unemployment accompanying a general depression. No one would question use of a form of dole or poor relief for the purpose. Establishment of public works projects administered by the state or local governments and utilizing the services of the unemployed with wages paid from public funds as in the 1929 national depression would be constitutionally feasible. In this connection, under no reasonable theory could it be declared beyond the power of a municipality to purchase the materials to be used in connection with the work, or the tools required for the workmen in its prosecution. Nor would operation of such projects by independent public agencies authorized by the Legislature and appointed and supported by the State, county or municipality run counter to the *Article* VIII ban on use of public funds. *Cf. City of Camden v. South Jersey Port Commission,* 4 *N. J.* 357, 368 (1950); *Romano v. Housing Auth. of Newark,* 123 *N. J. L.* 428 (*Sup. Ct.* 1939), affirmed 124 *N. J. L.* 452 (*E. & A.* 1940); *Rutgers College v. Morgan,* 70 *N. J. L.* 460 (*Sup. Ct.* 1904), affirmed 71 *N. J. L.* 663 (*E. & A.* 1905). These considerations indicate that the prohibition against lending of credit or money does not mean that the State and its political subdivisions cannot buy and pay for what they need to achieve public purposes. Nor do they signify that governmental units cannot employ the services of a third person or corporation to do any lawful act which they have the right to have done, and to pay for it. *Cf. McNichols v. City and County of Denver, supra; Hager v. Kentucky Children's Home Soc., supra.* It seems to follow, therefore, that if the purpose of a statute be public, as it clearly is here, the means of accomplishing it laid down thereby ought to be regarded as a matter of valid legislative policy so long as the means are restricted to the public end by the legislation and contractual obligation.

██ The answer to the question posed above, therefore, must depend upon the resolution of two subsidiary questions: Is the transaction, involving the transfer of public money, contractual in nature, and if so, is it based upon a substantial consideration from the recipient of the money apart from simply an obligation to repay the money with interest, which consideration is intimately associated and burdened with execution of the public purpose of the statute? Is the agreement of the recipient of the financial assistance to accomplish the public purpose of the statute, i. e., relief of unemployment, the paramount factor in the contract, and is any private advantage incidental and subordinate? If answers to these questions are in the affirmative, then the financial assistance contracted to be given by the Authority and the county or municipality is in return for an undertaking to bring about the public purpose within the framework and the safeguards of the statute. Such a transaction does not constitute a forbidden loan within the contemplation of *Article* VIII of the Constitution. It is a valid compact based upon an exchange of substantial considerations. *Cf. People ex rel. Gutknecht v. City of Chicago*, 414 *Ill.* 600, 111 *N. E.* 2d 626 (*Sup. Ct.* 1953).

██ It may facilitate matters to take up the two questions in reverse order. Courts have said, and we think rightly so, that the circumstance that some private benefit may be derived from the loan of public money as an incident of its use in the execution of a paramount public purpose will not bring the statutory authorization for the financial assistance within the constitutional ban. That fact alone will not so water down the consideration received by the State or political subdivision as to invalidate the transaction. *Roan v. Connecticut Industrial Building Comm'n.*, 150 *Conn.* 333, 189 *A.* 2d 399 (*Sup. Ct. Err.* 1963); *Visina v. Freeman*, 252 *Minn.* 177, 89 *N. W.* 2d 635 (*Sup. Ct.* 1958); *In re Opinion of the Justices*, 99 *N. H.* 519, 113 *A.* 2d 114 (*Sup. Ct.* 1955); *City of Frostberg v. Jenkins, supra; Cremer v. Peoria Housing Auth.*, 399 *Ill.* 579, 78 *N. E.* 2d 276, 283 (*Sup. Ct.*

1948) ; *Alameda County v. Janssen, supra;* and see, *Redfern v. Jersey City,* 137 *N. J. L.* 356 (*E. & A.* 1948) ; *Morris & Essex RR. v. Newark,* 76 *N. J. L.* 555 (*E. & A.* 1908) ; *Newark v. Public Service Co-Ordinated Transport,* 9 *N. J. Misc.* 722, 155 *A.* 469 (*Sup. Ct.* 1931). As hereafter indicated more fully, we are convinced that a contract between the Authority and the local governmental subdivisions as one unit and an area redevelopment agency as the second party, which satisfies the terms and conditions of the statute, of necessity, would have for its primary objective relief of unemployment, and that the loan would be so closely allied with the effectuation of such purpose that the private benefit radiating therefrom would be subordinate and incidental.

This brings us to the first of the subsidiary questions, *i. e.,* the nature of the relationship between the parties, Authority and county or municipality on the one hand, and the area redevelopment agency on the other. In our judgment it is broadly contractual; the scope and public purpose of the agency's agreed undertaking is clearly delineated and circumscribed by the federal and State acts, and the positive burden assumed by the agency in establishing and operating the project for the public purpose represents such a reasonable exchange of value in return for the financial assistance as to constitute sufficient consideration to make the constitutional limitation on loan or appropriation of public money inapplicable. The financial aid aspect is simply one part of a tripartite transaction the total aim of which is to alleviate unemployment. Involved, as we have said, are the federal, State and county or municipal governments on the one side, and the agency on the other, the agency being a sharply controlled conduit through which passes a limited amount of public money, its use being assigned to bringing the public purpose to fruition. In other words, by virtue of the contract, the private operator is so closely identified with accomplishment of the public purpose, and his business activity is so strictly pointed in that direction, that for practical purposes he represents the controlled means by which the government accom-

plishes a proper objective. See *Wilentz v. Hendrickson, supra* (133 *N. J. Eq.,* at *pp.* 479–482); *Newark v. Public Service Co-Ordinated Transport, supra; In re Opinion of the Justices* (*N. H.*), *supra.* A proposed agreement of an agency to establish and maintain the project in order that unemployment in the area may be diminished can be considered for negotiation only when in the judgment of the Authority the many preliminary qualifications and restrictive conditions imposed by the federal and State redevelopment acts warranting the proposed financial assistance have been shown to exist. If the preliminary tests are met satisfactorily and the limited financial assistance seems justified, the formal agreement may be made subject to such regulations and stipulations as will assure devotion of the project by the private operator to the primary public purpose of relieving unemployment. In short, the contract envisioned by the statute is such that during the operation of the project the paramount consideration in the private decision-making process must be relief of unemployment.

Let us look at the conditions and precautionary safeguards with which financial assistance to the private entrepreneur is surrounded under the federal and State legislation. In deciding the issue before us, both statutes should be considered because, as we have said above, they are complementary and interdependent.

The process begins when the Secretary of Commerce designates an area in New Jersey as a redevelopment area. He does this according to definite standards already set forth. Authorization in our statute to the New Jersey Area Redevelopment Authority to accept that decision does not constitute an improper delegation of legislative judgment. See *State v. Hotel Bar Foods,* 18 *N. J.* 115, 125–127 (1955); *Seale v. McKennon,* 215 *Or.* 562, 336 *P. 2d* 340 (*Sup. Ct.* 1959). When an area redevelopment agency applies to the state authority for financial assistance in the establishment of a project in the area, a duty exists to determine whether the agency has qualified for federal financial assistance. *L.* 1962,

*c.* 204, § 5(a)(2), *N. J. S. A.* 13:1B–15.17(a)(2). Among other things, this means the assistance is not available from private lenders or other federal agencies on reasonable terms, 42 *U. S. C. A.* § 2505(b)(4); also that the project is reasonably calculated to provide more than a temporary alleviation of unemployment or underemployment; that there is reasonable assurance of repayment of the federal loan; and that an over-all program for the economic development of the area has been submitted to and approved by the Secretary of Commerce. 42 *U. S. C. A.* § 2505(b)(3), (6), (10).

Then a determination must be made that the proposed project is consistent with the purpose of the New Jersey act, and will accomplish that purpose, that it is feasible and practicable, that the agency, whether person, partnership or corporation, is capable of assuming all obligations prescribed by the Authority in the establishment of the project and in its operation, and that the agency will agree with the Authority and the participating county or municipality to provide specified employment opportunities to a stipulated number of persons, and to carry on the project activities on a regular and continuous basis ("unless economic conditions will not otherwise permit for such period of time as shall be agreed upon"). *N. J. S. A.* 13:1B–15.13(i), 15.17(b), 15.20. These conditions must be applied under rules and regulations the Authority is authorized to adopt, *N. J. S. A.* 13:1B–15.17, in the light of the House Report referred to earlier (and 42 *U. S. C. A.* § 2505(a) implementing the report). The Report says the assistance provided should not be used to transfer industry and employment from an existing location. The objective is to cause a net expansion of job opportunities, not to pirate industries from other locations, or to finance "runaway" industries. 2 *U. S. Code Cong. Adm. News, supra,* at *p.* 1571.

If the Authority finds that the described conditions have been met, it may then determine the cost of establishing the proposed project, it may help in obtaining whatever federal financial assistance may be available, and it may agree to provide additional monetary aid up to 10% of the cost, which

222

percentage must be divided equally between it and the designated county or municipality. *N. J. S. A.* 13:1B–15.16. Appropriate contracts may then be entered into between the Authority, county or municipality and the agency, fixing the terms and amount of the loan, and containing such stipulations and conditions and reservations of control in the Authority as may be necessary to effectuate the public purpose of the act, and subject also to such rules and regulations of the Authority as may be designed to secure compliance with that purpose.

When the character of the contract is studied in light of the scope and restrictions of the federal and State laws, the fact becomes evident that although the agency establishing the project is a private one, it is so circumscribed in its operation as to be considered in a sense a controlled instrumentality with respect to its use of the limited public financial assistance. Obviously the funds of the State or a county or municipality could not be loaned to a private agency to be used as the agency pleased. Clearly the Constitution would stand in the way. But when the loan is granted for an obvious public purpose and its use confined to the execution of that purpose through a reasonable measure of control by a public authority by means of contractual stipulation, statutory and administrative regulation, the private agency takes on the form of a special public agent for the paramount purpose of devoting the money to relief of unemployment. *Cf. Hager v. Kentucky Children's Home Soc.*, supra (83 *S. W.*, at *pp.* 606, 607); *Kentucky Bldg. Comm'n. v. Effron*, 310 *Ky.* 355, 220 *S. W. 2d* 836 (*Ct. App.* 1949); *Legal v. Adorno*, 138 *Conn.* 134, 83 *A. 2d* 185, 191, 192 (*Sup. Ct. Err.* 1951). In this context also, it becomes apparent that the agency, in assuming the burden of serving the public purpose of relieving unemployment in return for the limited monetary aid from the Authority and county or municipality, furnishes a sufficiently substantial consideration to remove the transaction from the prohibition of *Article* VIII of the Constitution. *Cf. Trustees*

*of Rutgers College v. Richman,* 41 *N. J. Super.* 259, 295, 299 (*Ch. Div.* 1956).

The case is one of novel impression in New Jersey. We have said that an expenditure of public money is not to be condemned as unconstitutional because an incidental private benefit accompanies pursuit of the public purpose. Where such a double aspect is an accompaniment of a statute, courts seek the objective which is primary, and, for constitutional test, classify the purpose as public or private accordingly. *Hoglund v. City of Summit, supra* (28 *N. J.,* at *pp.* 548–549) and see *Redfern v. Jersey City, supra*; *Newark v. Public Service Co-Ordinated Transport, supra* (9 *N. J. Misc.,* at *p.* 725). In other jurisdictions in recent times legislation similar to our Area Redevelopment Assistance Act has been sustained against attack on constitutional grounds much the same as raised here.

One of the earliest cases in this field of legislative endeavor is *Albritton v. City of Winona, supra.* There the statute empowered municipalities to erect or acquire industrial plants and enterprises and to lease them to private operators on such terms and conditions and with such safeguards as "will best promote and protect the public interest," or to operate them under certain circumstances. Issuance of bonds was authorized to provide the necessary finances. Provision was made for the determination by the commission hereafter mentioned of the amount of taxes to be levied to retire the bonds. All income from the enterprises was required to be deposited in the bond retirement sinking fund.

The act created the Mississippi Industrial Commission and imposed on it the duty of carrying out the legislative objectives. To that end it was authorized, when requested by a municipality, to investigate and determine in the manner prescribed whether the public convenience and necessity require that the municipality be permitted to "acquire, to own and to operate" the particular type of industry found suitable to its needs under the provisions of the act.

Validity of the law was attacked as violative of a constitutional prohibition against the making of an appropriation or loaning the credit of. a municipality to any corporation or association. The Supreme Court declared that this economic condition confronted the legislature:

"(1) Thousands of our citizens, throughout the state, who are dependent on manual labor for a livelihood were without employment, and under the state's then economic and industrial setup would probably continue indefinitely so to be; and (2) agriculture, from which most of the state's citizens, either directly or indirectly, derive a livelihood, was at a low ebb with nothing to indicate that it would not indefinitely so continue." 178 *So.*, at *p.* 804.

Constitutionality of the enactment was upheld. The Supreme Court declared that the care of the poor, the relief of unemployment, and the promotion of agriculture and industry were proper governmental purposes. It said also:

"If the statute permits a lease of the property that would strip it of the purpose for which the statute permits its acquisition, * * *, and permitted it to be devoted wholly to private purposes, the tax to be levied in order to pay the bonds, by the sale of which the money for purchasing the property is to be obtained, would not be for a public purpose but in aid of private individuals, which under due process of law cannot be done. The statute does not so permit, for in all its parts it contemplates that the proposed industry shall be operated for the accomplishment of the purposes outlined therein, either by the municipality itself or, if the municipal authorities and the Mississippi Industrial Commission deem best, by a lessee under a lease containing 'such terms and conditions and with such safeguards as will best promote and protect the public interest.' The lease, therefore, must be of such character as will ensure the continued operation of the proposed industry with power in the municipality, under the supervision and control of the Mississippi Industrial Commission, to enforce the continued operation; in other words, the character of the lease must be such as, in effect, to constitute the lessee the municipality's agent for operating the industry without liability on the municipality to others growing thereout." *Id.*, at *p.* 807.

See Note, "The 'Public Purpose' of Municipal Financing For Industrial Development," 70 *Yale L. J.* 789, 795–799 (1961).

In *Roan v. Connecticut Industrial Building Comm'n, supra,* the legislature had adopted a statute creating an industrial

building commission and authorizing it, after investigation and subject to certain conditions, to insure mortgage payments on first mortgages on industrial projects, if the mortgage did not exceed 90% of the cost of the project or $5,000,000. The credit of the state was pledged to the performance of the insurance undertaking. An industrial project was defined as "any new building or real estate improvement, including remodeling or refurbishing of existing property, in Connecticut" if the building and premises would be used by "any industry for the manufacturing, processing or assembling of raw materials or manufactured products, or for industrially-connected research facilities, or warehousing, or which the commission determines will tend to provide gainful employment for the people of the state, increase the tax base of the economy and diversify and expand industry."

The act was challenged as unconstitutional on the ground that it authorized the use of public funds and the pledging of the state's credit for a private benefit. In rejecting the challenge the Supreme Court of Errors first noted that its function was not to appraise the wisdom of the legislation, but to determine if there was a reasonable ground on which it could be sustained. Then it said:

"[Plaintiff's] main argument that the act authorizes the use of public funds for private benefit and is devoid of a public purpose revolves around the claim that the benefit is to accrue to the mortgagee who is authorized to loan money on the project, with the state assuming the loss if the mortgagor defaults or is unable to meet his commitments. That the lenders derive a protection that ordinarily would not exist cannot be denied. But that is merely incidental to the principal reason for this legislation. The legislature was aware that Connecticut, the most industrialized state in the nation, faced competition in retaining its present industries and attracting new industries. Other states had enacted legislation to facilitate the financing of construction for new industry and the renovation and modernization of existing facilities. While the population of Connecticut was increasing, the number of industrial employees was decreasing. Substantial unemployment existed in many industrial areas, and factories which for many years had, in each instance, been the sole industry in a certain area had closed down. Existing plants, to a large extent, are so obsolete and inefficient that considerable manufacturing space is required merely to replace them, and it is also

necessary to construct new buildings to provide for the expansion of industry generally. Capital to finance industrial construction is not as readily available as it is for other purposes. Banks and insurance companies are limited by statute in making mortgage loans. * * * Without additional help of an emergency nature, the industrial growth of the state is likely to be impeded and the economy of the state vitally affected.

* * * * * * * *

It cannot be denied that the prosperity of this state and the general welfare of its public are dependent upon a healthy, growing industrial complex, diversified in character, housed in modern, up-to-date facilities geared to the technological advances of our times. Providing gainful employment for our people will increase their purchasing power, improve their living conditions, relieve the demand for unemployment or welfare assistance and advance the general economy. New or modernized buildings will add properties to the tax lists and increase the tax base to the general good of the community. That the industry which seeks an insured mortgage may initially benefit by the program because it stimulates the availability of otherwise unattainable financing, or that the mortgagee, who without such insurance would be unable to provide a loan to the extent permitted by the act, could in the event of default call upon the building commission to redeem his investment, is incidental to the prime purpose of the act and is not sufficient to defeat it. * * * We conclude that the act sufficiently states a public purpose and is not unconstitutional by reason of the fact that the purpose is not spelled out with clarion specificity." 189 A. 2d, at p. 402.

Finally, the court said the term "public use" defies absolute definition because it changes with varying conditions of society and changing conceptions of the scope and functions of government. Consequently courts have left each case to be decided on its own peculiar circumstances, conscious that the modern trend of judicial thought is to expand and construe liberally the meaning of "public purpose." 189 A. 2d, at pp. 404–405. See, also, In re Opinion of the Justices, 103 N. H. 258, 169 A. 2d 634 (Sup. Ct. 1961); McConnell v. City of Lebanon, supra.

The Maryland legislature passed an act empowering the City of Frostberg to purchase property and to construct or reconstruct buildings or other structures to be used by manufacturing companies agreeing to locate therein. Power to issue bonds or other certificates of indebtedness to obtain the necessary funds was granted. The city was authorized to

execute an agreement with any such company under which the company would purchase the land and buildings by means of installment payments over a period of years not to exceed twenty-five. Title would remain in the city until payment of the full purchase price.

A restraint was sought to prevent the holding of a special election to approve the issuance of bonds to provide a plant for a manufacturing company. The opposition was based upon a claim that the constitution barred the use of the city's credit to obtain funds for private purposes. The Court of Appeals upheld the act as serving a public purpose saying:

"The only declaration of public policy in the enabling act before us is the statement that the power is granted 'in order to encourage industrial development.' The legislative purpose, however, is somewhat amplified in the allegations of the answer, which are admitted for the purpose of this case, and we might, indeed, take judicial notice of the fact that the location of new industry in a municipality furnishes employment and measurably increases the resources of the community and its financial well-being. As the Supreme Court recognized in the Carmichael case, supra, the relief of unemployment is a legitimate public purpose. The fact that incidental benefits are passed on to the locating corporation is not fatal, if there are substantial public benefits to support the action taken." *City of Frostberg v. Jenkins, supra* (136 A. 2d, at pp. 855–856).

The Kentucky constitution provides that taxes can be levied only for a public purpose, and forbids a lending of a city's credit to a private corporation. A bond issue was approved by the voters of the City of London, the proceeds of which were to be used to finance the construction of an industrial building which was to be leased to private industry. The purpose of the plan was to attract new industry to the district and thereby reduce unemployment which had reached abnormal proportions.

The plan was assailed as contrary to the constitution but the state Supreme Court sustained it saying:

"The validity of a project of this type, which closely approaches public aid to private industrial interests, depends entirely upon the existence of underlying economic conditions which render the project essentially one of a 'public' nature. We think the City must estab-

lish with clear and convincing proof that such conditions exist. Since the record reveals that widespread unemployment exists in the City and its surrounding area, and shows that many citizens are in dire need of employment which they are more likely to obtain if new industry can be attracted to the area, we think the burden of proof imposed upon the City has been met." *Dyche v. City of London, supra* (288 *S. W. 2d,* at *p.* 650).

See, also, *Industrial Development Auth. v. Eastern Ky. Regional Planning Comm'n,* 332 *S. W. 2d* 274 *(Ky. Ct. App.* 1960) ; *In re Opinion of the Justices (Del), supra.*

A New Hampshire slum clearance and redevelopment law empowered public housing authorities created thereby to acquire land in a project area by purchase or eminent domain, using public funds to do so. Power was bestowed also to sell or lease the land after acquisition to private enterprise at "use value," which may be less than cost of acquisition, clearance and site improvements. Certain taxpayers claimed that even if the motive of the authority in instituting eminent domain proceedings was to effect slum clearance, public funds were used improperly if the intention was to sell or lease the land after acquisition to private persons. They urged also that such sale at less than cost would constitute a donation of public moneys represented by the difference between cost and sale price. The Supreme Court reiterated an earlier-expressed view that slum clearance is a public purpose, and it held that since resale or lease of the land in the project area was required to be conditioned upon subsequent use by the private purchaser in a manner consistent with the public redevelopment plan, no constitutional infirmity existed. Chief Justice Kenison, speaking for the court, said that if the public use which justified exercise of eminent domain in the first instance is the use of the property for purposes other than slums, that same public use continues after the property is transferred to private persons, such condition being an essential part of the transaction. *Velishka v. City of Nashua,* 99 *N. H.* 161, 106 *A. 2d* 571, 44 *A. L. R. 2d* 1406 (1954). Much the same situation was presented in *People ex rel. Gutknecht v. City of Chicago, supra,* where Justice Schaefer said:

"Sections 3(*l*) and 14 [of the statute] provide that the land for blighted vacant area redevelopment projects must be developed for predominantly residential uses. The 'use value' will thus be the value of the land, subject to restrictions placed upon it by the statute and the redevelopment plan. In this there is no donation of land to a private corporation, nor is there any loan of credit. The constitutional prohibition is not a bar to a municipality entering into a transaction where there is an exchange of considerations between the parties. *Cremer v. Peoria Housing Authority*, [*supra*], and cases there cited. Before the Commission may sell vacant land in a redevelopment project it must receive written undertakings from the developer. Section 5 of the State Grant Act of 1947 assailed in the *Cremer* case contained an identical provision concerning the undertakings required of a purchaser before a sale of land. There, it was pointed out that the developer 'suffered a legal detriment in agreeing to the construction program and the State received a benefit in that the public welfare will be served by the consequent partial reduction in the housing shortage.' " 111 *N. E. 2d*, at *pp.* 636–637.

 The cases referred to are not identical with our issue but they are sufficiently analogous and persuasive to demonstrate the modern tendency of legislatures to meet challenges presented by pressing socio-economic needs of our times. They re-emphasize also the long-established principle of judicial deference to the will of the lawmakers whenever reasonable men might differ as to whether the means devised to meet the public need conform to the Constitution. And they project into the foreground of judicial study of attacks thereon, the equally-settled doctrine that the means are presumptively valid, and that reasonably conflicting doubts should be resolved in favor of validity.

 In considering whether the statutory scheme represents performance of such a public purpose as will not offend the Constitution, we, too, are not unmindful of the role of the legislative branch of government. It must be assumed that the legislators are aware of the restrictions on use or loan of public money, and of the requirement that it be employed only for public purposes within the meaning of the Constitution. Consequently, when the Legislature promulgated the scheme described in the Area Redevelopment Assistance Act and declared it to represent a means of accomplishing a valid

public purpose, the decision is entitled to great weight in the courts. It should not be set aside as violative of the organic charter unless there is no reasonable basis for sustaining it. If there can be reasonable difference of opinion as to validity of a plan devised to effectuate a public purpose, the judiciary should defer to the legislative judgment. This is particularly true when the issue involves a concept which varies with the needs of the times and so is incapable of precise definition. *In re Opinion of the Justices (Del.), supra* (177 *A. 2d,* at pp. 212–214) ; *DeArmond v. Alaska State Development Corporation, supra* (376 *P. 2d,* at p. 721) ; *McConnell v. City of Lebanon, supra* (314 *S. W. 2d,* at p. 19). As the United States Supreme Court said in *Carmichael v. Southern Coal & Coke Co., supra*:

"The existence of local conditions which, because of their nature and extent, are of concern to the public as a whole, the modes of advancing the public interest by correcting them or avoiding their consequences, are peculiarly within the knowledge of the legislature, and to it, and not to the courts, is committed the duty and responsibility of making choice of the possible methods * * *. As with expenditures for the general welfare of the United States * * * whether the present expenditure serves a public purpose is a practical question addressed to the lawmaking department, and it would require a plain case of departure from every public purpose which could reasonably be conceived to justify the intervention of a court." 301 *U. S.,* at pp. 514–515, 57 *S. Ct.,* at p. 875, 81 *L. Ed.* 1245.

We must accept as obvious that chronic and persistent unemployment in certain areas of our State is capable of producing the public evils referred to in *Carmichael.* It is equally obvious that the Constitution does not guarantee a static condition of society, and that it does not incorporate the economic doctrine of *laissez-faire.* So long as the legislatively-established means of overcoming unemployment of the type here involved bear a substantial relation to the public welfare and can fairly be said to serve the desired public purpose, the court's function is not to strike down the legislative effort because of a possibility that it may lead ultimately to unwise or unfortunate results.

We realize that judicial decision as to the validity of legislation of the type under discussion here has not been unanimous. Compare *State ex rel. Saxbe v. Brand,* 176 *Ohio St.* 44, 197 *N. E. 2d* 328 *(Sup. Ct.* 1964); *In re Manistee Watch Co.,* 197 *F.* 455 *(W. D. Mich.* 1912); *State of Florida v. Town of No. Miami,* 59 *So. 2d* 779 *(Fla. Sup. Ct.* 1952); *State ex rel. Beck v. City of York,* 164 *Neb.* 223, 82 *N. W. 2d* 269 *(Sup. Ct.* 1957). But the decision we espouse is supported by the preponderance of authority. In our judgment on principle and philosophy, the majority view is the sounder one.

 Our task is to consider the validity of the Area Redevelopment Assistance Act only in terms of its primary public purpose, *i. e.,* relief of unemployment, and whether the incidental private benefit resulting from the financial assistance to the agency causes an unavoidable and fatal collision with *Article* VIII of the Constitution. We hold that such assistance and incidental private benefit, as parts of an overall contractual undertaking supported by a substantial exchange of considerations, and circumscribed by conditions which insure devotion of the assistance to the relief of unemployment, do not invade the article. In the sense of the constitutional limitation, the funds are not appropriated or loaned for the agency but for the public purpose which it binds itself to serve. Such conclusion does no violence to the basic principles of the organic law; rather, it serves the judicial duty to interpret the language in such fashion as will permit the application of those principles to changes in the economic, social and political life of the people.

## III.

 The Treasurer argues further that the Area Redevelopment Assistance Act violates *Article* III, *Section* I of the Constitution, the separation of powers clause, in that it improperly delegates legislative power to the executive branch of the government. More particularly, he charges that the

Authority is given such unbridled discretion in the administration of the act as to constitute an abdication of the duty of the Legislature to make the law. It is true, of course, that a statute of this type must impose basic standards, guidelines and a reasonably definite policy to be followed in its administration. But, as Justice Jacobs said for this Court in *State v. Hotel Bar Foods, supra* (18 *N. J.*, at *p.* 124), the "exigencies of modern government have increasingly dictated the use of general, rather than minutely detailed standards."

We have set forth in Part II hereof the many guidelines the Authority must follow, the fact findings that must be made and the conditions that must be met before an application for financial assistance by an area redevelopment agency can be approved and the requisite contract executed. They need not be repeated here. Suffice it to say that they provide adequate restraints on the discretion of the Authority to make certain that the agency is qualified under both federal and state acts to receive the limited financial assistance provided for, that the agency, whether an individual or corporation, is reliable and responsible, that the project is feasible and practicable, and that it and the financial assistance will be devoted primarily to the public purpose envisioned by the Legislature, namely, relief of unemployment. In the circumstances we cannot accept the notion that the guidelines should have been made more certain. *Roan v. Connecticut Industrial Building Comm'n, supra* (189 *A.* 2d, at *pp.* 403–404); *Velishka v. City of Nashua, supra* (106 *A.* 2d, at *p.* 575); *People ex rel. Gutknecht v. City of Chicago, supra* (111 *N. E.* 2d, at *p.* 636); *DeArmond v. Alaska State Development Corporation, supra.*

## IV.

The Treasurer contends also that the act is a private, special or local law granting exclusive privileges to corporations, associations or individuals contrary to *Article* IV, *Section* VII, *paragraph* 9 of the Constitution. The contention may be disposed of summarily.

 A law is "general" (1) if the class of subjects established, recognized or regulated is distinguished by characteristics sufficiently marked and important to make it a class by itself, and (2) if it encompasses all of the subjects which reasonably belong within the classification, and does not exclude any which naturally belong therein. A law is private, special or local if it arbitrarily or unnaturally excludes any subject which should be included. *Harvey v. Essex County Board of Freeholders*, 30 *N. J.* 381, 389 (1959).

 The Area Redevelopment Assistance Act satisfies these requirements. It applies to *any* individual, association or corporation qualifying for the financial assistance under the general standards established therein. It is true that only projects located in counties or municipalities which have been designated redevelopment areas can qualify. But whenever a condition of persistent unemployment occurs in *any* area of the State, and the condition meets the test laid down in the federal law, the Secretary of Commerce is under a mandate to declare it a redevelopment area and thus make the relief provided by our act available to a proper agency in the locality. Consequently, the benefits are available potentially to any part of the State where the misfortune of chronic unemployment comes into being. Moreover, it may be noted that while the direct and immediate benefits are provided for the distressed area, it cannot be gainsaid that an indirect diffusion of them would affect the whole State beneficially.

We see no merit in this claim of unconstitutionality.

## V.

The other challenges to the validity of the act have been considered and require no discussion. We are satisfied they have no substance.

For all the reasons discussed above, we find no constitutional infirmity in the Area Redevelopment Assistance Act, *L.* 1962, *c.* 204, *N. J. S. A.* 13:1B–15.13 *et seq.* Consequently, the judgment of the Superior Court, Law Division, is affirmed.

HALL, J. (concurring). If this were the first case to arise concerning the meaning and application of the public aid prohibitions of the New Jersey Constitution, I would think it ought to go the other way.

The provisions of the *Constitution* of 1947 are taken verbatim from earlier enactments. *Art.* VIII, *sec.* II, *par.* 1 was found in the *Constitution* of 1844 as *Art.* IV, *sec.* VI, *par.* 3. *Art.* VIII, *sec.* III, *pars.* 2 and 3, were copied from 1875 amendments to the 1844 document which became *Art.* I, *pars.* 19 and 20 thereof. The language is precise and positive, as well as all-encompassing, a fact not true of the analogous constitutional provisions of most other states. The terminology used is not generally susceptible of elastic construction like the phrases "due process of law" or "equal protection of the laws."

The original purpose and intended scope of constitutional prohibitions like ours seem to me to become very plain when we recall the elementary general proposition that, even in the absence of a constitutional prohibition, a state or its political subdivisions may not utilize public moneys to the aid of individual interests and personal purposes of profit and gain which are not of a public character, thus perverting the power of taxation. *Citizens' Savings & Loan Association v. Topeka,* 87 *U. S.* (20 *Wall.*) 655, 22 *L. Ed.* 455 (1875). This leading case was decided only a few months before the previously mentioned amendments to our constitution. It would therefore seem that the initial intent of those amendments, and similar enactments in many other states, was not just to prohibit use of public funds and credit for private enterprises of a nonpublic character, for no constitutional provision was needed therefor, but rather to make it unlawful to provide such aid even for privately owned operations having a public purpose. This thesis appears to undergird the rationale of those modern state decisions which hold that their constitutional provisions prohibit public assistance in the latter class of situations. *State ex rel. Saxbe, Atty. Genl. v. Brand,* 176 *Ohio St.* 44, 197 *N. E. 2d* 328 *(Sup. Ct.* 1964) ; *Village of*

*Moyie Springs v. Aurora Manufacturing Co.,* 82 *Idaho* 337, 353 *P. 2d* 767 *(Sup. Ct.* 1960) ; *State ex rel. Beck v. City of York,* 164 *Neb.* 223, 82 *N. W. 2d* 269 *(Sup. Ct.* 1957) ; *State v. Town of North Miami,* 59 *So. 2d* 779 *(Fla. Sup. Ct.* 1952).

Despite this basic background, courts of most states having constitutional public aid limitations in one form or another came to say that, broadly speaking, the prohibitions did not apply where the private enterprise aided had a public purpose or character. The expansion of the role of government in late years has naturally resulted in enlargement of the public function category. See the comprehensive review of the entire subject in Pinsky, "State Constitutional Limitations on Public Industrial Financing: An Historical and Economic Approach," 111 *U. Pa. L. Rev.* 265 (1963).

The New Jersey courts generally followed and developed this approach, with certain ramifications not necessary to be detailed here, and it became rather well established as a result of decisional law prior to the adoption of the *Constitution of* 1947. See, *e. g., Rutgers College v. Morgan,* 70 *N. J. L.* 460 *(Sup. Ct.* 1904), affirmed 71 *N. J. L.* 663 *(E. & A.* 1905) ; *Morris and Essex R. R. Co. v. Newark,* 76 *N. J. L.* 555 *(E. & A.* 1908) ; *Wilentz v. Hendrickson,* 135 *N. J. Eq.* 244 *(E. & A.* 1944). Identical re-enactment of the former provisions in 1947 must be said to amount to ratification of the prior construction. Subsequent cases have reiterated the doctrine. So I think it has to be said that the majority opinion correctly summarizes the law of this State to date in this respect. Even though it might well be thought that this interpretation of the constitutional prohibitions is fundamentally wrong, it seems quite improper to so hold at this late date.

The majority opinion, in effect, utilizes three criteria to take a public aid project out of the constitutional prohibitions, *viz.,* that the purpose is a public one, that the nature of the enterprise is such as is likely to effectuate that purpose, and that a sufficient measure of public control is provided to assure effectuation and safeguard the public investment, so to

speak. And this particular project is found to meet the criteria. Again I believe these conclusions accord with prior law as a logical modern development thereof. Therefore I concur with the result reached, but on the basis of precedent rather than principle.

I do feel, however, that approval of the legislation and scheme here involved carries non-applicability of the constitutional prohibitions about as far as can be without completely writing them off. Aiding unemployment is certainly a proper public purpose and the conditions precedent to aid are probably as tight as practicable. The effectuation of the public aim by means of the essentially marginal projects assisted by this legislation does, however, approach the speculative. The extent of subsequent public control over the enterprise and its continuance in service of the underlying purpose, as well as the protection of the public investment, once the loan is made, is minimal, although perhaps as much as can be practically imposed. Contractual consideration for the aid beyond the obligation to repay the loan, upon which the majority relies in good part, seems barely sufficient. But the scheme is essentially a federal one with very slight local financial participation.

If our precise and positive constitutional public aid limitations have become anachronistic and unrealistic in this day and age, as they very probably have, amendment of the organic document should be undertaken. Such a course is infinitely sounder and more desirable than changes therein made *ad hoc* by the judicial and legislative branches of government.

Justice HANEMAN joins in this concurring opinion.

HALL and HANEMAN, JJ, concurring in result.

*For affirmance* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.