710 A.2d 1028

TOWNSHIP OF BERKELEY HEIGHTS, A MUNICIPAL CORPORA-
TION OF THE STATE OF NEW JERSEY, PLAINTIFF–RE-
SPONDENT/CROSS–APPELLANT, v. COUNTY OF UNION, DE-
FENDANT–APPELLANT/CROSS–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued April 30, 1998 [1]—Decided May 18, 1998.

---

[1] This appeal, originally scheduled to be argued April 29, 1998, was argued
telephonically April 30, 1998.

Before Judges D'ANNUNZIO, A.A. RODRIGUEZ and COBURN.

*Robert F. Varady* argued the cause for appellant/cross-respondent (*La Corte, Bundy and Varady,* attorneys; *Mr. Varady,* on the brief).

*John C. Phillips* argued the cause for plaintiff-respondent/cross-appellant (*Buttermore, Mullen, Jeremiah and Phillips,* attorneys; *Mr. Phillips,* of counsel and on the brief).

The opinion of the court was delivered by

COBURN, J.A.D.

The County of Union appeals and the Township of Berkeley Heights cross-appeals from a summary judgment in the Tax Court which eliminated the tax exempt status of county property, known as the John E. Runnells Hospital, effective August 1, 1993. The judgment imposed an assessment of $4,376,000 for the last five months of 1993 and all of 1994, which translates into a tax burden on the County of approximately $250,453.

The property had been owned by the County since 1911 and had been actively devoted to providing health care, a public purpose, until 1991. In 1985, the County contracted to sell the property to a private corporation, Connell Rice & Sugar, Inc. Title closed a decade later in June 1995. The County contends that the property did not lose its tax exempt status until title closed. The

Township contends that taxation of the property should have been permitted as of January 1, 1993.

The Township concedes that after contracting to sell the property, and after the patients were removed in 1991, the County was entitled to continued tax exempt status while the property was being readied for transfer for a reasonable period of time. The dispute centers on the question of when that time expired. The Township claims that the closing of title should have occurred by the end of 1992. The County relies upon the presence of various environmental and other problems which it claims delayed the closing, despite all its efforts, until June 1995. The Tax Court, after considering the evidence bearing on those issues, determined that by July 23, 1993, the date on which the County sent a time-of-the-essence letter to its purchaser, the reasonable time for property preparation had expired and the property was no longer being devoted to a public purpose. We find that the position taken by the County is sound and that the Tax Court judgment must be reversed.

## I.

In 1911, the County of Union purchased the property, consisting of about sixty-four acres, and began construction of a treatment facility for tuberculosis, which opened in 1912 as the Bonnie Burn Sanitarium. In 1955, the facility expanded to include general medical services and was renamed John E. Runnells Hospital. In 1966, a large nursing home for the care of the elderly was added. By the early 1980s the hospital was experiencing substantial operating deficits and the County decided to sell the property and open a new hospital on another site.

In 1985, the County agreed to sell the property to Connell, Rice & Sugar, Inc. ("Connell"), for $13,500,000. The agreement was unusual in that Connell was required to pay all but $1,350,000 of the purchase price by January 31, 1986. Although the contract indicates that the initial $12,150,000 was to be held in escrow pending closing, in fact, and apparently without objection from

Connell, that money was used for construction of the replacement health-care facility, which was to be erected within three years on another site in Berkeley Heights. Towards the end of 1991, construction of the new facility, transfer of all patients, and closing of the Runnells site had been accomplished. However, there was still much to be done before the sale to Connell could be completed.

On the critical issue of whether or not excessive time had been spent in preparing the property for closing, the County relied primarily upon the affidavit of Armand A. Fiorletti, the holder of a master's degree in civil engineering and a licensed professional engineer, land surveyor, and planner in this state. He became the County's Director of Engineering in 1978, and he currently holds the position of Director of the Department of Operational Services for the County. Within his jurisdiction are the divisions of engineering, planning, buildings and grounds, public works, parks, and recreation. He supervises a work force of almost 500 employees. Mr. Fiorletti's affidavit contains the following information bearing on the complex and time consuming problems which confronted the County as it attempted to satisfy environmental and other concerns which impeded closing:

4. In my professional capacity I was called upon to make numerous recommendations during this period of time to the Board of Chosen Freeholders relative to measures to be taken by the County to comply with the applicable statutes, rules and regulations of the DEP relative to environmental remediation on the site, specifically relating to the landfill and underground storage tanks. I also recommended to the Board of Chosen Freeholders which type of professional consultants and contractors was required, and my Department prepared the necessary Requests For Proposals as well as technical specifications where appropriate.

5. I personally monitored the scope and progress of the work and its conformance with all DEP requirements. I approved all requisitions for payments as well as recommending to the Board of Chosen Freeholders the issuance of any necessary change orders.

6. I am aware that the Township of Berkeley Heights asserts that the County "abandoned" the subject property. This position is without foundation in fact. I was intimately involved with the County activities, work and efforts on the site from as early as 1987 when James C. Anderson Associates (JCA) was hired to provide professional services and guidance relative to the closure of the landfill on the property up until title was passed in June of 1995. An outline of the work and

activities of the County on this site during the relevant time period is hereinafter set forth:

A. *LANDFILL*

(1) The landfill at JERH was originally permitted by the DEP in 1979.

(2) Subsequent to the execution of the contract of sale in 1985 with the contract purchaser, Connell Rice & Sugar, the County retained JCA in 1987 to prepare, pursuant to DEP regulations, a Closure and Post Closure Care and Financial Plan for the landfill on the property. The first draft plan was submitted by JCA in August 1987.

(3) The chief obstacle initially encountered was the requirement of the DEP that the County place in an escrow account the sum of almost $500,000.00 so as to guarantee that the funds required for all post closure care and maintenance of the landfill over the statutory 30–year period of responsibility would be available. The County pursued alternate methods with DEP to satisfy this requirement so as to avoid having to tie up such a sum for long a period of time.

(4) While these legal and financial matters were being resolved, the County proceeded to implement fully the technical requirements of the Closure Plan, i.e. installation and monitoring of groundwater and gas monitoring wells, soil cover, seeding and drainage improvement. This work was done at some risk to the County in view of the fact that no approval had been granted by the DEP for the full plan.

(5) JCA certified that the technical requirements had been completed in accordance with the requirements of the Department in December 1992. However, in 1993 the Department notified JCA that elevated levels of certain chemical parameters were detected in the groundwater monitoring at the site requiring further action by the County.

(6) A ground water quality assessment was immediately conducted by the County and a report submitted to the DEP in October of 1993. In November 1993 the DEP responded with a requirement for additional work on the site relative to the groundwater contamination which included the installation of three additional groundwater monitoring wells, and another round of sample analysis. The County took immediate steps through its consultant to comply with the additional work and expense associated with this demand. (Exhibit A)

(7) This additional work was promptly completed and the report submitted to the DEP in May of 1994. In December 1994, the DEP issued a draft Closure/Post Closure Plan Approval; a draft Administrative Consent Order and Summary of Financial Plan Review. One final revision was made to the Closure and Post Closure Care and Financial Plan and it was submitted to the Department in January 1995.

(8) The Closure and Post Closure Plan Approval and Administrative Consent Order were issued by the Department on May 19, 1995. (Exhibit B) Throughout the entire process the County constantly urged JCA to wherever possible seek to expedite the review and approval process through the DEP.

(9) In addition to the work performed by JCA on the landfill, the County hired W.C. Services, Inc. to install underground gas and water monitoring wells for a cost of $27,853.00 and Keegan Technology to perform testing for $98,250.00.

(10) James C. Anderson Assocs., Inc. was actively involved with respect to the meeting of all the requirements of DEP for closure of the landfill at Runnells Hospital from February of 1987 to May of 1995 at a cost to the County of $77,939.42. This company's summary of the project is attached as Exhibit C.

### B.  UNDERGROUND STORAGE TANKS

(1) The old Runnels Hospital property contained several underground storage tanks. The Underground Storage Tank Act required that these tanks be removed and that any contamination be remediated pursuant to DEP regulations.

(2) The County retained the services of Matrix Environmental Management, Inc. in September 1992 to provide the necessary underground storage tank management services in order to comply with the statute. The County specifically directed Matrix to begin its work with the old Runnells Hospital property. The specifications were also prepared and advertised on an expedited basis and a contract was entered into for the actual removal of the tanks.

(3) Upon removal,contamination was discovered at two of the sites. A plan was prepared by Matrix for the necessary remediation work and submitted to the DEP in October of 1993. The County anticipated a period of approximately 30 days for review and/or approval or adjustment of the plan.

(4) The County was then advised that the DEP had conducted a major internal reorganization and had imposed a "freeze" on all reviews of new submissions. We were also advised that the case manager who had been working on the project from the outset would be substituted for a then as yet unknown new case manager. Neither the County nor the consultant could get any effective response as to how long it would now take for the necessary review of the plan in order that work could move forward.

(5) At that time, i.e. December 1993, the on site investigation and analysis that had been performed by the consultant produced an opinion that it appeared that the total time period necessary to complete the remediation project could likely be two to three years at a cost of $300,000.00 to $425,000.00. This of course was only the consultant's opinion since the final determination would be made by the requirements imposed by DEP based upon a review of the proposed plan which review the County was unsuccessful in expediting.

(6) The County explored with the consultant any and all possible means to expedite this process. The consultant recommended that the County enter into a Memorandum of Agreement (MOA) Program pursuant to the Voluntary Cleanup Program with the New Jersey Department of Environmental Protection. This program was designed to allow property owners to move ahead with site investigation and remediation activities in an expedited manner in exchange for payment of review fees to the Department. The County chose to enter into this program due to its desire to obtain DEP approval as quickly as possible.

(7) The consultant had also advised the County that in entering into the program the County would have to incur the risk that the Department might choose to examine areas outside and beyond that which was being sought to be expedited and require and demand remediation of wholly unrelated portions of the site or the work recommended by the consultant would ultimately prove to be beyond the scope of DEP requirements. Despite this dilemma, the County forthwith completed the necessary application and entered into the program. The County's consultant together with the representatives of the Department devised alternative methods of groundwater remediation and were successful in very substantially reducing both the time and cost estimate in order to complete the successful remediation.

(8) In addition to the work performed by Matrix on the underground storage tanks, Luzon Oil Co. was hired at a cost of $227,382.01 to perform the tank removal.

(9) After approval of the modified remediation plans, the Department finally issued the NFA (No Further Action) letter on June 8, 1995. (Exhibit D) Matrix Environmental Management, Inc. commenced its work on the Runnells site on behalf of the County in September 1992 and continued its activities until the issuance of the No Further Action letter in June of 1995. The total cost paid to Matrix was approximately $155,000.00. This consultant's summary of the project is attached as Exhibit E.

C. *RESTORATION OF THE POND*

(1) In the fall of 1993, The County was called upon by DEP to excavate and restore a large pond on the property which had, at some unknown time in the past, been filled in by County personnel. Such activity was in violation of the DEP regulations since no DEP permit for it had apparently been obtained. This work was originally to be performed by the contract purchaser if it had obtained site plan approval from the Berkeley Heights Planning Board. When approval was denied, the DEP notified the County it was responsible to do the work.

(2) Contracts were immediately awarded for both the engineering and actual construction components. The work was instantly commenced and completion was accomplished in October of 1993 at a cost of $122,546.00. The action was quickly taken and completed by the County acknowledging its governmental responsibility to adhere to all environmental rules and regulations as well as to remove the issue as to any obstacle to effectuating a closing.

D. *BERKELEY HEIGHTS MAINTENANCE CODE*

(1) In June of 1993 the Township of Berkeley Heights adopted a property maintenance code which set forth in detail the requirement of property mainte-nance for all types of structures and land within the Township.

(2) This caused the County, the Township and the contract purchaser to negoti-ate an acceptable level of maintenance for the old Runnells Hospital.

(3) As a result of this agreement, employees from my department were called upon to perform numerous maintenance activities such as cutting grass and shrubs, boarding up windows/doors and removing refuse. These activities

expended considerable staff time and resources and cost the County in excess of $85,000.00. (Exhibit F)

(7) The total expenditure of funds by the County for work on the subject property up to and including the time of conveyance of title in June of 1995 is in the neighborhood of $800,000.00 These charges have been paid and are supported by detailed requisitions and vouchers in the files of my Department. A fairly comprehensive list of the outside contractor's costs is attached as Exhibit G.

(8) From November 1990 to June 1995 employees of my Department and I were actively engaged in pursuing DEP approvals, or dealing with other matters relating to the property for which the County was responsible, either to satisfy the DEP requirements or to effectuate a transfer of title. The substantial expenditure of funds set forth in paragraph 7 does not include the hundreds of man hours expended by my own and other Divisions of the County, including the Office of the County Counsel.

The material factual assertions contained in Mr. Fiorletti's affidavit were buttressed by reports of environmental experts employed by the County to remediate various problems existing on the site and by copies of correspondence passing between the County, various state officials or agencies, and counsel for Connell. By way of opposition, the Township simply asserted in general terms that all the environmental issues could have been resolved in less time. For example, the Township's brief contains the following statements:

Delays apparently occurred ... because of the County's inability to secure DEP clearance for closure of an existing landfill and the cleanup of underground contamination on the site. Although the reasons for the delay in closing appear to stem from delays by the County and its failure to diligently pursue the necessary clearances, those delays are not relevant to the removal of the tax exempt status of the property.

\* \* \*

The delays and difficulties encountered by the County, whether or not of its own making or created by others, cannot work to the detriment of the taxpayers of the Township....

In short, the Township's position, unsupported by facts, is that once the active use of the facility ceased in 1991 the closing should have been accomplished by the end of 1992.

## II.

*N.J.S.A.* 54:4–3.3 provides that "the property of the respective counties ... used for public purposes ... shall be deemed exempt from taxation...." As the Court observed in *Roe v. Kervick,* 42 *N.J.* 191, 199 *A.*2d 834 (1964), the "modern trend of judicial thought is to expand and construe liberally the meaning of 'public purpose.'" *Id.* at 226, 199 *A.*2d 834 (citations omitted).

> Generally speaking, it [public purpose] connotes an activity which serves as a benefit to the community as a whole, and which, at the same time is directly related to the functions of government. Moreover, it cannot be static in its implications. To be serviceable it must expand when necessary to encompass changing public needs of a modern dynamic society. Thus it is incapable of exact or perduring definition. In each instance where the test is to be applied the decision must be reached with reference to the object sought to be accomplished and to the degree and manner in which the object affects the public welfare.
>
> [*Id.* at 207, 199 *A.*2d 834 (citations omitted).]

In *Walter Reade, Inc. v. Township of Dennis,* 36 *N.J.* 435, 177 *A.*2d 752 (1962), the Court observed that tax "exemptions in favor of governmental agencies should be liberally construed." *Id.* at 440, 177 *A.*2d 752 (citation omitted).

In *New Jersey Turnpike Auth. v. Township of Washington,* 16 *N.J.* 38, 106 *A.*2d 4 (1954), the Court held that "vacant land ... not now in the public use or presently intended for public use is taxable even when owned by bodies having a right to tax exemption with respect to property used for an appropriate purpose." *Id.* at 44, 106 *A.*2d 4 (citations omitted).

In *County of Bergen v. Borough of Paramus,* 79 *N.J.* 302, 399 *A.*2d 616 (1979), the Court explained that "use" in this context means more than "actual" use:

> To interpret the word "use" to mean only actual use would be unrealistic, for a period of time will undoubtedly run between acquisition and placing the property in use. Some lead time will be involved due to readying the land and constructing whatever type of structures may be needed. Between these extremes is what we conceive to be the legislative intent—namely, a present intent to devote the property to a public use within a reasonable length of time.
>
> [*Id.* at 308, 399 *A.*2d 616.]

Given the admonition in *Roe v. Kervick, supra,* and *Walter Reade, Inc., supra,* that the concept of "public purpose" under

*N.J.S.A.* 54:4–3.3 is to be construed liberally, we perceive no distinction for tax exemption between the time reasonably needed to ready for use land purchased for a public purpose, recognized as legitimate by *County of Bergen, supra,* and the time reasonably needed to ready for sale land no longer needed for a public purpose. As demonstrated by the facts of this case, there are often a multitude of legal complexities connected with present-day transfers of property, particularly because of the advent of extremely demanding environmental laws and regulations. Therefore, a public entity involved in the sale of property previously devoted to a public use is entitled to a reasonable period of time to consummate the sale during which the tax exempt status of the property shall continue.

In these proceedings, the burden of proof to establish the tax exempt status of the property up to the closing of title in 1995 was on the County. *County of Bergen, supra,* 79 *N.J.* at 310, 399 *A.*2d 616. We are satisfied that burden was met. The Tax Court placed undue emphasis on the County's time-of-the-essence letter dated July 23, 1993, calling for a closing in September of that year. The letter reveals a number of outstanding issues which, it was hoped, would be cleared up by the closing date. However, as is obvious from the affidavit of Mr. Fiorletti and the documents to which he refers, there were still a number of environmental problems and other issues which the County reasonably wanted to clear up before closing. There is absolutely no suggestion in this record that either the County or Connell wanted anything but an expeditious closing. Connell had invested over $12,000,000 in 1985 and was anxious to get title and start construction. The County was still owed over a million dollars, which it could not receive until closing, and it was expending substantial public funds to keep the property maintained. On May 19, 1995, the Department of Environmental Protection finally approved the County's Closure and Post–Closure Plan. The next month title closed. In light of all the circumstances surrounding this complex land transaction, we are satisfied that the period of time between closing of the facility

in 1991 and the closing of title in 1995, extensive though it was, represented nothing more than that reasonably required to prepare the site for transfer.

Reversed.